IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | Chapter 7 |
| | ) | |
| Martwone A. Johnson and | ) | Case Number 19-31480 |
| Octavia S. Johnson, | ) | |
| | ) | Hon. Jacqueline P. Cox |
| Debtors. | | |

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| *ex. rel.* ILLINOIS DEPARTMENT OF | ) | |
| HUMAN SERVICES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Adversary No. 20-00264 |
| Martwone A. Johnson and | ) | |
| Octavia S. Johnson, | ) | |
| Defendants. | ) | |

## AMENDED ADVERSARY COMPLAINT
## TO DETERMINE DISCHARGEABILITY OF DEBT

Plaintiff, the PEOPLE OF THE STATE OF ILLINOIS, *ex. rel.* ILLINOIS

DEPARTMENT OF HUMAN SERVICES, through its attorney, KWAME RAOUL, the

Attorney General of the State of Illinois, files its amended complaint to determine

dischargeability of certain debts of the Debtors pursuant to 11 U.S.C. § 523(a). For its Amended

Complaint, Plaintiff alleges and states as follows:


## PARTIES

1.     On November 5, 2019, Debtors Martwone A. Johnson and Octavia S. Johnson (neé

Berry) filed a petition for relief under chapter 7 of the Bankruptcy Code, which case was

assigned case number 19-31480.

1

2.    Plaintiff is the State of Illinois operating through the Illinois Department of Human
      Services (DHS).

3.    Debtors are residents of the State of Illinois and live in Cook County, Illinois.

4.    Plaintiff seeks to have the debt Debtors owe to it determined non-dischargeable.


## JURISDICTION

5.    Plaintiff brings this adversary complaint to determine dischargeability of debt under 11
      U.S.C. § 523(a)(2) and pursuant to Bankruptcy Rule 7001.

6.    This Court has jurisdiction pursuant to 28 U.S.C. § 157 and 28 U.S.C. § 1334.

7.    This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

8.    Plaintiff knowingly and voluntarily consents to this Court's entry of a judgment in any
      proceeding determined to be non-core.

9.    Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. § 1409(a).


## BACKGROUND

10.   DHS, through its Child Care Assistance Program (CCAP), provides working families of
      low income with access to affordable child care.

11.   If a parent is eligible for CCAP benefits, then DHS pays part of the cost of the parent's
      child care.

12.   CCAP funds are paid directly to the child care provider named on the parent's application
      for CCAP benefits.

13.   Illinois Action for Children (IAFC) manages CCAP on behalf of DHS in Cook County,
      Illinois. (DHS and IAFC will be referred to as "DHS.")

14.     Title 89 of Illinois's Administrative Code regulates DHS's social services, including

CCAP.

15.     Pursuant to Section 50.130 of the administrative code,

"[t]he Department will recover overpayments from providers or parents and other
relatives, as appropriate, through demand letters, referrals to the Comptroller's
Office for withholding, referrals to collection agencies, reductions in future
payments or public assistance benefits, or other means determined by the
Department to be effective." Ill. Admin. Code tit. 89 § 50.130 (2015).


I.      **OCTAVIA JOHNSON (f/k/a Octavia Berry) (hereafter "Octavia")**

16.     Octavia is at the center of a scheme to qualify parents, who were not eligible for CCAP

benefits, for CCAP benefits.

17.     As a result of the scheme, Octavia and her husband, Martwone Johnson, received CCAP

funds exceeding $750,000.00.

18.     Octavia was a licensed child care provider. *See* Letter from DCFS attached hereto as

Exhibit A.

19.     Octavia provided child care from real property commonly known as 5952 West Rice in

Chicago, Illinois (hereafter "5952 West Rice").

20.     Octavia owns the real property commonly known as 5952 West Rice.

21.     Octavia completed DHS's Child Care Applications, Requests for Redetermination Forms

(Child Care Applications and Requests for Redetermination Forms will hereafter be

referred to as "Application"), Change of Information Forms (hereafter "COI"), Change of

Provider Forms (hereafter "COP"), and Wage Verification Forms (hereafter "Wage

Verification") from employers Walk By Faith Cleaning & Moving Services (hereafter

"Walk By Faith") and Rita's Boutique, Inc. (hereafter "Boutique") on behalf of at least a dozen parents (hereafter "Parents").

22.    The handwriting on the Applications, COIs, COPs, and Wage Verifications is Octavia's. *See* Group Exhibits D through O.

23.    The handwriting on the Applications, COIs, COPs, and Wage Verifications on documents filed in the underlying bankruptcy, 19-31480, including the Chapter 7 Voluntary Petition (Doc. No. 1), the Reaffirmation Agreement with Ally Financial (Doc. No. 7), the Reaffirmation Agreement with JPMorgan Chase Bank National Association (Doc No. 33), and the Note (attached as Exhibit 3 to Doc. No. 19) is Octavia's.

24.    Octavia also signed Parents' names to Applications and COIs.

25.    Octavia also signed providers' names to warrants for CCAP funds issued by the State of Illinois that Octavia counter-signed.

26.    Unless otherwise noted, the Applications, Income Verifications, Wage Verifications, COIs, and COPs were delivered to DHS via walk-in at IAFC's Damen Location.

27.    Octavia signed the owner's name to Walk By Faith Wage Verifications.

28.    Octavia's husband, Martwone Johnson, was the sole proprietor of Walk By Faith.[1] *See* City of Chicago Licenses attached hereto as Group Exhibit B and incorporated by reference herein.

29.    Octavia signed the owner's name to Rita's Boutique, Inc. (hereafter "Boutique") Wage Verifications.

30.    Octavia's mother, Rita Thompson, was Boutique's owner. *See* City of Chicago Licenses attached hereto as Group Exhibit C and incorporated by reference herein.

---

[1] Upon information and belief, Octavia also signed Martwone's name to the documents filed in the underlying bankruptcy – 19-31480.

31.     Email communications from Boutique's vendors, however, went to Octavia's email
        address.

32.     Applications, COIs, COPs, and Wage Verifications completed by Octavia contain false
        representations regarding Parents' employment and Parents' childcare providers.

33.     Octavia engaged in the regular practice of making false representations in Applications,
        COIs, COPs, and Wage Verifications submitted to DHS for Parents.

34.     Octavia knew the representations in the Applications, COIs, COPs, and Wage
        Verifications she completed to be false.

35.     Or, Octavia acted with reckless disregard for the truth of the representations in the
        Applications, COIs, COPs, and Wage Verifications she completed.

36.     Octavia was issued or counter-signed CCAP funds in the amount of $589,054.80.

37.     Octavia retained the CCAP funds referred to above.


II.     **MARTWONE JOHNSON (hereafter "Martwone")**

38.     Martwone received CCAP funds as a result of false pretenses.

39.     Upon information and belief, Martwone was responsible for Walk By Faith's business
        operations, including hiring staff, booking jobs, scheduling staff for jobs, and paying
        staff.

40.     Walk By Faith did not report employment wages paid to employees of Walk By Faith to
        the Illinois Department of Employment Security (IDES).

41.     Representations in Applications and Wage Verifications regarding the Parents'
        employment by Walk By Faith were false.

42.    Martwone knew that Walk By Faith did not employ Parents as represented in Applications and Wage Verifications.

43.    According to Applications, Martwone provided childcare.

44.    Martwone knew that representations in Applications, COIs, and COPs regarding childcare he provided were false.

45.    Martwone was issued or counter-signed CCAP funds in the amount of $194,473.77.

46.    Martwone retained the CCAP funds referred to above.

### III.    THE PARENTS

#### i.    Latoya Wall (f/k/a Latoya Berry) (hereafter "Latoya")

47.    Octavia completed Applications and Wage Verifications submitted to DHS for Latoya. *See* Group Exhibit D attached hereto and incorporated by reference herein.

48.    Latoya is Octavia's sister.

49.    Latoya received CCAP benefits between January 2009 and November 2017.

50.    Latoya was not eligible for those CCAP benefits.

51.    Between January 2009 and November 2017, Octavia received CCAP funds in the amount of $226,288.49 for child care she allegedly provided to Latoya's children.

52.    Octavia was overpaid those CCAP funds.

### Latoya's Bankruptcies

53.    Latoya filed for chapter 13 bankruptcy in 2014, 2015, and 2018.

54.    Case numbers 14-19735, 15-04840, and 18-10790 were assigned to Latoya's bankruptcies.

55.    In Schedule I of bankruptcy 14-19735, Latoya's occupation is listed as "Cash Job

Daycare Worker and SSD." *See* 14-19735 Voluntary Petition, Doc. No. 1.

56.    Schedule I of 14-19735 does not include any other source of income.

57.    The Statement of Financial Affairs (SOFA) of bankruptcy 14-19735 does not include any

income earned from other employment from the (two) 2 years prior to 2014.

58.    In Schedule I of bankruptcy 15-04840, Latoya's occupation is listed as "Kids First

Daycare" located at "5952 W. Rice, 2nd floor, Chicago, IL 60651." *See* 15-04840

Voluntary Petition, Doc. No. 1.

59.    According to Schedule I of bankruptcy 15-04840, "Kids First Daycare" was located at

"5952 W. Rice, 2nd floor, Chicago, IL 60651." *See* 15-04840 Voluntary Petition, Doc.

No. 1.

60.    Schedule I of 15-04840 indicates that Latoya had worked at Kids First Daycare for "3

years (sporadically)."

61.    Schedule I of 15-04840 does not include any other source of income.

62.    The SOFA of bankruptcy 15-04840 does not include any income earned from other

employment from the (two) 2 years prior to 2015.

63.    Octavia provided childcare for Latoya's children at 5952 West Rice in 2012, 2013, and

2014 and 2015.

64.    Octavia employed Latoya to provide childcare at 5952 West Rice in 2012, 2013, 2014,

and 2015.

65.    Latoya's employment with Octavia was omitted from Applications submitted to DHS on

behalf of Latoya for CCAP benefits in 2012, 2013, 2014 or 2015.

### Sho Diva or Shoe Diva

66. On September 8, 2008, an Application was submitted to DHS. *See* Group Exhibit D, 1-4.

67. The September 8, 2008 Application lists Latoya's employer as "Sho Diva."

68. According to the September 8, 2008 Application, Sho Diva was located at "5247 W. North Av. [sic], Chicago, IL 60651."

69. A search of Illinois's Secretary of State for "Sho Diva" and "Sho Diva, Inc." did not return any records.

70. Upon information and belief, Sho Diva did not report wages paid to Latoya to IDES.

71. Also submitted on September 8, 2008 were two (2) pay stubs from "Sho Diva, Inc.," which are dated "Aug. 15, 2008" and "Aug. 29, 2008," respectively. *See* Group Exhibit D, 5-6.

72. The pay stubs referred to in the paragraph above have inconsistent information on them.

73. The check number at the top of the August 15, 2008 pay stub is "00823," but the check number at the bottom of the August 15, 2008 pay stub is "009261."

74. The check number at the top of the August 29, 2008 pay stub is "008340," but the check number at the bottom of the August 29, 2008 pay stub is "009278."

75. The year-to-date income on the August 15, 2008 pay stub is $8,293.34; the year-to-date income on the August 29, 2008 pay stub is $8,768.34 – a difference of $475.00.

76. According to the August 29, 2008 pay stub, Latoya earned $495.00 for that pay period – not $475.00.

77. Six (6) months later, on March 16, 2009, an Application was submitted to DHS. *See* Group Exhibit D, 7-12.

78.    The March 16, 2009 Application lists Latoya's employer as "Shoe Diva," not "Sho Diva."

79.    The March 16, 2009 Application indicates that Latoya's job at Shoe Diva is not "a new job since your last application/redetermination."

80.    According to the March 16, 2009 Application, Shoe Diva was located at "5248 W. North Av. [sic], Chicago, IL, 60639."

81.    A search of Illinois's Secretary of State Corporation/LLC Search for "Shoe Diva" and "Shoe Diva, Inc." did not return any records.

82.    Also submitted on March 16, 2009 were two (2) pay stubs from "Shoe Diva, Inc., which are dated "February 13, 2009" and "February 27, 2009," respectively. *See* Group Exhibit D, 13-14.

83.    The format of the February 13, 2009 and February 27, 2009 Shoe Diva pay stubs is different than the August 15, 2008 and August 29, 2008 Sho Diva, Inc. pay stubs.

84.    The format of the February 13, 2009 and February 27, 2009 Shoe Diva pay stubs is the same as that of pay stubs dated January 4, 2013 and January 18, 2013, which were submitted to DHS for Latoya in January 2013 for Latoya's future employer, Chicago Graphic. *See* Group Exhibit D, 65-66.

85.    The February 13, 2009 and February 27, 2009 Shoe Diva pay stubs and the January 4, 2013 and January 18, 2013 Chicago Graphic pay stubs have the same "Employee ID Number" 2040713.

86.    The February 13, 2009 and February 27, 2009 Shoe Diva pay stubs include the number "0000001349" above Latoya's name.

87.   Likewise, January 4, 2013 and January 18, 2013 pay stubs purported to be from Chicago

Graphic include "0000001349" above Latoya's name.

88.   The pay stubs submitted for Latoya and purported to be from Sho Diva, or Shoe Diva,

were altered.

**God Bless You Soul Food Restaurant**

89.   On April 13, 2009, an Application was submitted to DHS. *See* Group Exhibit D, 15-18.

90.   The April 13, 2009 Application lists Latoya's employer as "God Bless You Soul

Restaurant" (hereafter "God Bless You").

91.   The April 13, 2009 Application indicates Latoya began working at God Bless You on

March 25, 2009.

92.   The April 13, 2009 Application indicates that Latoya earns "7.00" per hour.

93.   Upon information and belief, God Bless You did not report wages paid to Latoya to

IDES.

94.   Also submitted to DHS on April 13, 2009 was an Income Verification from "God Bless

You Soul Food Res." *See* Group Exhibit D, 19.

95.   The handwriting on the April 13, 2009 Income Verification is Octavia's.

96.   The April 13, 2009 Income Verification is purported to be signed by business owner

"Latoya Carry."

97.   The April 13, 2009 Income Verification indicates that Latoya began working at God

Bless You on March 23, 2009.

98.   On May 5, 2009, DHS received via mail two (2) pay stubs from "God Bless You Soul Food Rest" which are dated "April 17, 2009" and "May 1, 2009," respectively. *See* Group Exhibit D, 20-21.

99.   The pay rate on the April 17, 2009 and May 1, 2009 pay stubs is "7.75," not 7.00.

100.  The format of the April 17, 2009 and May 1, 2009 God Bless You pay stubs is the same as the August 15, 2008 and August 29, 2008 Sho- Diva, Inc. pay stubs.

101.  The "Employee File #" in the top left corner of the Sho Diva, Inc. pay stubs and all the God Bless You pay stubs is the same – 1237.

102.  Likewise, the conflicting check numbers on the August 15, 2008 Sho Diva, Inc. pay stub – referred to above – are the same conflicting check numbers on the April 17, 2009 God Bless You pay stubs.

103.  On November 3, 2009, pay stubs purported to be from God Bless You and dated October 16, 2009 and October 30, 2009 were submitted to DHS. *See* Group Exhibit D, 22-23.

104.  The year-to-date income on the October 16, 2009 pay stub is "3,380.00."

105.  October 30, 2009 was the next bi-weekly pay period.

106.  The year-to-date income on the October 30, 2009 pay stub is "3,845.60."

107.  The October 30, 2009 pay stub indicates Latoya earned "465.00" – not "465.60."

108.  On July 6, 2010, an Application was submitted to DHS. *See* Group Exhibit D, 24-27.

109.  The July 6, 2010 Application indicates that Latoya began working at God Bless You in October 2009, not March 2009.

110.  October 2009 is after the dates on the April 17, 2009 and May 1, 2009 pay stubs.

111.  Also submitted to DHS on July 6, 2010 were June 11, 2010 and June 25, 2010 pay stubs. *See* Group Exhibit D, 28-29.

112.    The year-to-date income on both the June 11, 2010 and June 25, 2010 pay stubs is the same as that on the October 16, 2009 pay stub – "3,380.00."

113.    On July 27, 2010, July 9, 2010 and July 23, 2010 pay stubs were submitted to DHS. *See* Group Exhibit D, 30-31.

114.    The July 9, 2010 would have been the next bi-weekly pay stub after the June 25, 2010 pay stub.

115.    The year-to-date income on the July 9, 2010 pay stub is $6,347.25, which is $2,967.25 more than the June 25, 2010 pay stub, but earnings for July 9, 2010 were only $488.25.

116.    On August 5, 2010, an Income Verification was submitted to DHS. *See* Group Exhibit D, 32.

117.    The handwriting on the August 5, 2010 Income Verification is Octavia's.

118.    The August 5, 2010 Income Verification is purported to be signed by business owner "Joe Fourner."

119.    The August 5, 2010 Income Verification indicates that Latoya began working at God Bless you in October 2009, not March 2009.

120.    On January 7, 2011, an Application was submitted to DHS for Latoya by leaving the same in an IAFC drop box. *See* Group Exhibit D, 33-36.

121.    Also on January 7, 2011, God Bless You pay stubs from December 10, 2010 and December 24, 2010 were in the same drop box. *See* Group Exhibit D, 37-38.

122.    The year-to-date income on the December 10, 2010 pay stub is $12,820.25.

123.    The year-to-date income on the December 24, 2010 pay stub is only $12,308.50.

124.    On July 29, 2011, an Application was submitted to DHS for Latoya by leaving the same in an IAFC drop box. *See* Group Exhibit D, 39-42.

125.   Also on July 29, 2011, God Bless You pay stubs from July 8, 2011 and July 22, 2011 were in the same drop box. *See* Group Exhibit D, 43-44.

126.   The year-to-date income on both the July 8, 2011 and July 22, 2011 pay stubs is also $12,820.25.

127.   The check number on the bottom of the December 10, 2010, December 24, 2010, July 8, 2011, and July 22, 2011 pay stubs is the same – "010005."

128.   The pay stubs submitted for Latoya and purported to be from God Bless You were altered.


**TLM & Associates**

129.   On or around January 26, 2012, an Application was submitted to DHS by leaving the same in an IAFC drop box. *See* Group Exhibit D, 45-48.

130.   The January 26, 2012 Application lists Latoya's employer as "TLM & Associates" (hereafter "TLM").

131.   TLM was owned by Tanyea Mack (f/k/a Tanyea Curry) (hereafter "Tanyea").

132.   Tanyea is Octavia's friend.

133.   The January 20, 2012 Application indicates Latoya began working at TLM on January 9, 2012.

134.   Latoya's job title is listed as "Customer Service Rep."

135.   The January 26, 2012 Application indicates that Latoya earned "8.25" per hour.

136.   TLM did not report wages paid to Latoya to IDES.

137.   Paychex, Inc. pay stubs ("February 3, 2012 Pay Stubs") purported to be from TLM were also submitted to DHS. *See* Group Exhibit D, 49-50.

138.    The pay rate on the pay stubs is "9.00," not "8.25."

139.    The pay period is the same on both the pay stubs: "01/15/12 to 01/27/12."

140.    The check date on both the pay stubs is the same: "02/03/12."

141.    The check number on both the pay stubs is the same: "20846."

142.    The net pay on both the pay stubs is the same: "469.18."

143.    But one of the February 3, 2012 pay stubs has a year-to-date income of "1,407.54" and the other pay stub has a year-to-date income of "1,876.72."

144.    On July 5, 2012, an Application was submitted to DHS. *See* Group Exhibit D, 51-55.

145.    The July 5, 2012 Application indicated that Latoya was still employed by TLM.

146.    According to the July 5, 2012 Application, Latoya was paid "8.75" per hour.

147.    Also submitted to DHS on July 5, 2012 were two (2) Paychex pay stubs purported to be from TLM and dated "06/15/12" and "06/29/12," respectively. *See* Group Exhibit D, 57-58.

148.    The format of the June 15, 2012 and June 29, 2012 pay stubs is different from the February 3, 2012 pay stubs.

149.    Latoya's address on the February 3, 2012 pay stubs is "1920 S. Christiana, Chicago, IL 60623."

150.    Latoya's address on the June 15, 2012 and June 29, 2012 pay stubs is "1919 S. Hamlin, Chicago, IL 60623."

151.    The "Employee ID" on the February 3, 2012 pay stubs is "171."

152.    The "EMPL#" on the June 15, 2012 and June 29, 2012 pay stubs is "00901."

153.    The pay rate on the June 15, 2012 and June 29, 2012 pay stubs is "9.00," not 8.75.

154.  On January 22, 2013, an Application was submitted to DHS for Latoya by leaving the same in an IAFC drop box. *See* Group Exhibit D, 59-64.

155.  The January 22, 2013 Application indicated that Latoya was still employed by TLM.

156.  According to the January 22, 2013 Application, Latoya was paid "8.75" per hour.

157.  Also in the drop box on January 22, 2013 were 2 pay stubs dated January 4, 2013 and January 18, 2013. *See* Group Exhibit D, 65-66.

158.  The January 4, 2013 and January 18, 2013 pay stubs have a format similar to the February 3, 2012 pay stubs.

159.  Latoya's address on the January 4, 2013 and January 18, 2013 pay stubs is the same as that on the February 3, 2012 pay stubs.

160.  The "Employee ID" is the same on the January 2013 and February 3, 2012 pay stubs: 171.

161.  The check number on the January 4, 2013 and January 18, 2013 pay stubs is the same: "22077."

162.  The pay rate on the January 4, 2013 and January 18, 2013 is only "8.50."

163.  On July 22, 2013, an Application was submitted to DHS for Latoya by leaving the same in an IAFC drop box. *See* Group Exhibit D, 67-72.

164.  The July 22, 2013 Application indicated that Latoya was still employed by TLM.

165.  According to the July 22, 2013 Application, Latoya was paid "8.75" per hour.

166.  Also in the drop box on July 22, 2013 were 2 of Latoya's pay stubs purported to be from TLM and dated July 5, 2013 and July 19, 2013. *See* Group Exhibit D, 73-74.

167.  The July 5, 2013 and July 19, 2013 pay stubs have a format similar to the February 3, 2012 and January 4, 2013 and January 18, 2013 pay stubs.

168.   The July 5, 2013 and July 19, 2013 pay stubs are out of sequence – based on the January 4, 2013 and January 18, 2013 pay stubs, July's bi-weekly pay periods would be July 12, 2013 and July 26, 2013.

169.   The pay rate on the July 5, 2013 and July 19, 2013 pay stubs is only "8.50."

170.   On August 28, 2013, a Wage Verification was submitted to DHS for Latoya by leaving the same in an IAFC drop box. *See* Group Exhibit D, 75.

171.   The August 28, 2013 Wage Verification indicates that Latoya started at TLM on December 1, 2012, not January 2012.

172.   The December 1, 2012 start date is after the dates on the purported TLM pay stubs submitted for Latoya.

173.   On January 16, 2014, an Application was submitted to DHS. *See* Group Exhibit D, 76-81.

174.   The January 16, 2014 Application indicated that Latoya was still employed by TLM.

175.   The January 16, 2014 Application also indicated that Latoya started at TLM on December 1, 2012.

176.   According to the January 16, 2014 Application, Latoya was paid "8.75" per hour.

177.   On February 2, 2014, Paychex, Inc. pay stubs dated January 10, 2014 and January 24, 2014 and purported to be from TLM were submitted to DHS via facsimile. *See* Group Exhibit D, 82-83.

178.   The hire date on the January 10, 2014 and January 24, 2014 pay stubs is March 10, 2010.

179.   The January 10, 2014 and January 24, 2014 pay stubs have a direct deposit notation on them.

180.   The direct deposit notation indicates that "1,4871.11" was deposited to an account ending in 4132.

181.    But, the net pay on the January 10, 2014 and January 24, 2014 pay stubs was only

"452.21."

182.    A message in the bottom left corner of the January 10, 2014 and January 24, 2014 pay

stubs instructs

"[p]lease note that if your position requires driving that we need up to date
Driver's License and Auto Insurance. Please send to ld@tpgstaffus.com. Thank
you. Thank you for working an SAS location."

183.    Upon information and belief, tpgstaffus.com is the website of TPG Staffing, LLC, a

foreign limited liability company from New Jersey that was registered to do business in

Illinois.

184.    The Employee ID on the January 10, 2014 and January 24, 2014 pay stubs is different

from that on other TLM pay stubs.

185.    Paychex, Inc. pay stubs dated May 30, 2014 and June 13, 2014 and purported to be from

TLM were also submitted to DHS for Latoya. *See* Group Exhibit D, 84-85.

186.    The May 30, 2014 and June 13, 2014 pay stubs also have March 10, 2010 as Latoya's

hire date.

187.    The pay period on the May 30, 2014 pay stub is "05/11/13 to 05/24/14."

188.    The pay period on the June 13, 2014 pay stub is "05/25/13 to 6/07/14."

189.    The pay stubs submitted for Latoya and purported to be from TLM were altered.

**Chicago Graphic**

190.    The July 5, 2012 Application included a second employer: Chicago Graphic. *See* Group

Exhibit D, 51-55.

191.   The July 5, 2012 Application indicated Latoya began working at Chicago Graphic on July 1, 2012.

192.   The July 5, 2012 Application indicates that Latoya earned "8.75" per hour.

193.   Latoya's job hours are listed as one o'clock p.m. to six o'clock p.m. Monday through Friday and noon to five o'clock p.m. on Saturday.

194.   The January 22, 2013 Application also indicates that Latoya was employed by TLM and Chicago Graphic. *See* Group Exhibit D, 65-66.

195.   Latoya's job title, pay rate, and job hours at Chicago Graphic are the same in the January 22, 2013 Application as they are in the July 5, 2012 Application.

196.   Also submitted to DHS on January 22, 2013 via drop box were two (2) ADP pay stubs – dated January 4, 2013 and January 18, 2013 - purported to be from Chicago Graphic. *See* Group Exhibit D, 86-87.

197.   The pay rate on the January 4, 2013 and January 18, 2013 pay stubs is "8.50," not 8.75.

198.   The July 22, 2013 Application also indicated that Latoya was employed by both TLM and Chicago Graphic. *See* Group Exhibit D, 67-72.

199.   Also in the drop box on July 22, 2013 were two (2) of Latoya's pay stubs purported to be from Chicago Graphics and dated July 5, 2013 and July 19, 2013. *See* Group Exhibit D, 88-89.

200.   As noted in Paragraph 90 above, the July 5, 2013 and July 19, 2013 Chicago Graphic pay stubs are similar to the February 13, 2009 and February 27, 2009 Shoe Diva pay stubs.

201.   The format of the July 5, 2013 and July 19, 2013 pay stubs is different from the format of the January 4, 2013 and January 18, 2013 pay stubs.

202. The "Employee ID Number" on the July 5, 2013 and July 19, 2013 Chicago Graphic pay stubs is 2040713.

203. The "Employee #" on the July 5, 2013 and July 19, 2013 Chicago Graphic pay stubs is "103377."

204. The January 16, 2014 Application indicated that Latoya was still employed by TLM and Chicago Graphic. *See* Group Exhibit D, 76-81.

205. The January 16, 2014 Application indicated that Latoya started at Chicago Graphic on July 1, 2013.

206. July 1, 2013 is after the dates on Chicago Graphic pay stubs submitted for Latoya.

207. On February 2, 2014, an ADP pay stub dated January 24, 2014 and purported to be from Chicago Graphic was submitted to DHS via facsimile. *See* Group Exhibit D, 89.

208. The format of the January 24, 2014 pay stub is different from the format of the January 4, 2013 and January 18, 2013 paystubs and the July 5, 2013 and July 19, 2013 pay stubs.

209. "Payroll" is not spelled correctly on the January 24, 2014 pay stub.

210. Pay stubs purported to be from Chicago Graphic and dated May 30, 2014; June 13, 2014; December 11, 2015; December 25, 2015; December 9, 2016; December 23, 2016; June 9, 2017; June 23, 2017; October 13, 2017; and October 27, 2017, all of which have an ADP format similar to the January 24, 2014 pay stub and mis-spell the word "payroll," were also submitted to DHS for Latoya. *See* Group Exhibit D, 91-100.

211. The December 9, 2016, December 23, 2016; June 9, 2017; June 23, 2017; October 13, 2017; and October 27, 2017 pay stubs are out of sequence. *See* Group Exhibit D, 95-100.

212.   Pay stubs purported to be from Chicago Graphic and dated June 5, 2015; June 10, 2016; and June 24, 2016 were also submitted to DHS for Latoya. *See* Group Exhibit D, 101-104.

213.   The June 5, 2015; June 10, 2016; and June 24, 2016 pay stubs have a Paychex format.

214.   Two Chicago Graphic pay stubs, both of which are dated June 5, 2015, have the same check number, "00152911," same pay period, and same net pay amount, "$452.21," but different year-to-date income amounts. *See* Group Exhibit D, 101-102.

215.   The 00152911 check number on the June 5, 2015 pay stubs is also on the June 13, 2014 TLM pay stub. *See* Group Exhibit D, 85.

216.   The June 5, 2015 Chicago Graphic pay stubs and the June 13, 2014 TLM pay stub also have the same net pay amount, the same employee identification number, and the same hire date. *See* Group Exhibit D, 101-102; *see also See* Group Exhibit D, 85.

217.   The address for Chicago Graphic on the June 5, 2015 pay stubs is "5258 W. Norh [sic] Ave., Chicago, IL 60639."

218.   The address for Chicago Graphic on the June 10, 2016; and June 24, 2016 pay stubs is "5258 W. North Ave., Chicago, IL 60639."

219.   The address for Chicago Graphic on the ADP format pay stubs is "5244 W. North Ave., Chicago, IL 60639."

220.   The employee identification number on the June 10, 2016; and June 24, 2016 is different from that on the June 5, 2015 pay stubs.

221.   The pay stubs submitted for Latoya and purported to be from Chicago Graphics were altered.

**Boutique**

222. On or around June 16, 2015, an Application was submitted to DHS. *See* Group Exhibit D, 105-110.

223. The June 16, 2015 Application lists Latoya's employers as Chicago Graphic and Boutique.

224. The June 16, 2015 Application indicates Latoya began working at Boutique on June 1, 2015.

225. Latoya's job title is listed as "Customer Service Rep."

226. The June 16, 2015 Application indicates that Latoya earned "8.75" per hour.

227. Latoya's job hours at Boutique are listed as noon to five o'clock p.m. Monday through Saturday.

228. The alleged job hours at Boutique in the June 16, 2015 Application are the same as Latoya's job hours at Chicago Graphic as indicated on the July 5, 2012 Application; January 22, 2013 Application; July 22, 2013 Application; January 16, 2014 Application; January 4, 2016 Application; June 27, 2016 Application and a letter dated August 24, 2015 from Chicago Graphic. *See* Group Exhibit D, 111.

229. The Chicago Graphic job hours in the June 16, 2015 Application, 5:30 p.m. to 10:30 p.m., are not the same as with the job hours in the Applications and August 24, 2015 Chicago Graphic Letter referred to above.

230. A Wage Verification was also submitted to DHS on June 16, 2015. *See* Group Exhibit D, 112.

231. The June 16, 2015 Wage Verification includes the same employment information as the June 16, 2015 Application.

232.  According to the June 16, 2015 Wage Verification, Boutique paid Latoya cash.

233.  Boutique's owner, Rita, also applied for CCAP benefits from DHS.

234.  Rita is Latoya's mother.

235.  Self-Employment Records for Rita were submitted to DHS on November 2, 2015. *See* Group Exhibit E, 1-14.

236.  According to the Self-Employment Records for Rita, Rita became self-employed with Boutique in July 2015.

237.  The Self-Employment Records are for the months August, September, and October 2015.

238.  The Self-Employment Records include Boutique's income and expenses for those months.

239.  The Self-Employment Records do not include a pay roll expense for Latoya.

240.  The Applications, Income Verifications, and Wage Verifications, and pay stubs submitted to DHS for Latoya contain false representations about Latoya's employment and employment income.

241.  Octavia knew that representations regarding Latoya's employment and employment income in the Applications, Income Verifications, and Wage Verifications Octavia completed were false, or Octavia completed the Applications, Income Verifications, and Wage Verifications with reckless disregard for the truth of the representations in them.

### ii.  **Rita Thompson (hereafter "Rita")**

242.  Octavia completed an Application and Wage Verification submitted to DHS for Rita. *See* Group Exhibit E.

243.  Rita is Octavia's mother.

244.   Rita filed for chapter 13 bankruptcy on February 11, 2015, case number 15-04423, and June 12, 2015, case number 15-20541.

245.   According to the Schedule I of each of the above-referenced bankruptcies, Rita was "not employed."

246.   Likewise, Rita did not report any employment income for the three (3) years preceding the bankruptcies in either SOFA.

247.   On July 16, 2015, an Application was submitted to DHS for Rita. *See* Group Exhibit E, 15-18.

248.   According to the July 16, 2015 Application, Rita was employed by "Qualities Behavioral" as a "Behavioral Help Assistant."

249.   Also submitted to DHS on July 16, 2015 was a Wage Verification purported to be from Qualities Behavioral. *See* Group Exhibit E, 19.

250.   The handwriting on the Application and Wage Verification is Octavia's.

251.   Upon information and belief, Octavia also signed the owner's name, "Myriam Tillman," to the Wage Verification.

252.   Upon information and belief, the representations in the July 16, 2015 Application and Wage Verification were false.

253.   Octavia knew that representations regarding Rita's employment and employment income in the July 16, 2015 Application and Wage Verification were false, or Octavia completed the Application and Wage Verification with reckless disregard for the truth of the representations in them.

### iii.  **Nakeisha Strickland (hereafter "Nakeisha")**

254. Octavia completed Applications and Wage Verifications submitted to DHS for Nakeisha. *See* Group Exhibit F.

255. Octavia was also Nakeisha's childcare provider.

256. Between March 2014 and October 2017, Nakeisha was the beneficiary of CCAP in the amount of $92,315.05.

257. Nakeisha was not eligible for those CCAP benefits.

258. Between March 2014 and October 2017, Octavia received CCAP funds in the amount of $92,315.05 for child care she allegedly provided to Nakeisha's children.

259. Octavia was overpaid CCAP funds in the amount of $92,315.05.


## **TLM**

260. According to documents submitted to DHS for Nakeisha, Nakeisha also worked for TLM and Boutique.

261. On March 16, 2015, an Application was submitted to DHS for Nakeisha. *See* Group Exhibit F, 1-4.

262. According to the March 16, 2015 Application, Nakeisha worked for TLM.

263. The March 16, 2015 Application indicates that Nakeisha earned "8.75" per hour.

264. Nakeisha's job hours are listed as six o'clock p.m. to eleven o'clock p.m. 7 days a week.

265. Nakeisha was paid "every 2 weeks."

266. Also submitted on March 16, 2015 are 2 pay stubs purported to be from TLM and dated February 27, 2015 and March 13, 2015. *See* Group Exhibit F, 5-6.

267.    The February 27, 2015 and March 13, 2015 pay stubs are similar to the January 10, 2014 and January 24, 2014 TLM pay stubs submitted for Latoya. *See* Group Exhibit D, 82-83.

268.    The February 27, 2014 and March 13, 2015 pay stubs include a similar message to that on Latoya's January 10, 2014 and January 24, 2014 TLM pay stubs.

269.    The February 27, 2015 and March 13, 2015 pay stubs indicate that Nakeisha worked only thirty-five (35) hours each bi-weekly pay period – not seventy (70).

270.    On May 7, 2015, a COI was submitted to DHS for Nakeisha. *See* Group Exhibit F, 7-14.

271.    According to the May 7, 2015 COI, Nakeisha started working for TLM on July 1, 2012.

272.    Also submitted on May 7, 2015 COI were pay stubs purported to be from TLM that were dated April 10, 2015 and April 24, 2015. *See* Group Exhibit F, 15-16.

273.    There would have been one bi-weekly pay period – March 27, 2015 – between the March 13, 2015 and April 10, 2015 pay stubs.

274.    The year-to-date gross income on the March 13, 2015 pay stub was "1,837.50."

275.    The year-to-date gross earned income on the April 10, 2015 pay stub was "4,814.20,"

276.    The gross income earned on the April 10, 2015 pay stub was "612.50."

277.    According to the March 13, 2015 and April 10, 2015 pay stubs, the gross earned income on the March 27, 2015 pay stub would have been $2,364.20.

278.    The year-to-date hours on the March 13, 2015 pay stub were "210."

279.    The year-to-date hours on the April 10, 2015 pay stub were "480.20."

280.    According to the March 13, 2015 and April 10, 2015 pay stubs, the gross hours on the March 27, 2015 pay stub would have been 270.20 for one bi-weekly pay period.

281.  The employment information in the TLM pay stubs submitted for Nakeisha is not consistent with the employment information in the March 16, 2015 Application and May 7, 2015 COI.

282.  The pay stubs submitted to DHS for Nakeisha were altered.

**Boutique**

283.  On June 29, 2015, an Application was submitted to DHS for Nakeisha.

284.  According to the June 29, 2015 Application, Nakeisha worked for Boutique.

285.  According to the June 29, 2015 Application, Nakeisha started working for Boutique on June 13, 2015.

286.  A Wage Verification was also submitted to DHS on June 29, 2015. *See* Group Exhibit F, 17-20.

287.  The June 29, 2015 Wage Verification also indicates that Nakeisha started working for Boutique on June 13, 2015. *See* Group Exhibit F, 21.

288.  The employment information in the June 29, 2015 Wage Verification is the same as that in the June 29, 2015 Application.

289.  According to the Self-Employment Records submitted to DHS for Rita on November 2, 2015, Rita became self-employed with Boutique in July 2015. *See* Group Exhibit E, 1-14.

290.  The Self-Employment Records do not include a pay roll expense for Nakeisha.

291.  An Application submitted to DHS on October 13, 2016, however, indicates that Nakeisha started working for Boutique in "2016." *See* Group Exhibit F, 21-25.

292.  The Applications and Wage Verifications submitted to DHS for Nakeisha contain false representations about Nakeisha's employment and employment income.

26

293. Octavia knew that representations in the Applications and Wage Verifications regarding Nakeisha's employment and employment income were false, or completed the Applications and Wage Verifications with reckless disregard for the truth of the representations in them.

### iv. Angela Lott (hereafter "Angela")

294. Octavia completed Applications and Wage Verifications submitted to DHS for Angela. *See* Group Exhibit G.

295. Octavia also provided child care for Angela's children.

296. Between June 2016 and November 2017, Angela was the beneficiary of CCAP in the amount of $30,666.96.

297. Angela was not eligible for those CCAP benefits.

298. Between June 2016 and November 2017, Octavia received CCAP funds in the amount of $30,666.96 for child care she allegedly provided to Angela's children.

299. Octavia was overpaid those CCAP funds.

300. Applications and Wage Verifications submitted to DHS for Angela have inconsistent employment information on them.

301. On June 21, 2016, an Application was submitted for Angela to DHS. *See* Group Exhibit G, 1-4.

302. According to the June 21, 2016 Application, Angela began working for Walk By Faith on June 1, 2016.

303. Angela's job title at Walk By Faith is listed as "Customer Service Rep."

304.  Applications submitted to DHS for Angela on August 29, 2016 and December 12, 2016 list the same employment information and job title: "Cleaning Assistant." *See* Group Exhibit G, 5-12.

305.  An Application submitted to DHS for Angela on February 14, 2017 lists Angela's job title as "Cleaning Service Rep." *See* Group Exhibit E, 13-16.

306.  An Application signed August 1, 2017 indicates Angela started at Walk By Faith in "2016." *See* Group Exhibit G, 17-20.

307.  But a Wage Verification signed the same day indicated that Angela started "2-2-17." *See* Group Exhibit G, 21.

308.  On January 30, 2018, Angela's 2016 federal income tax return was submitted to DHS. *See* Group Exhibit G, 22-29.

309.  According to Angela's 2016 tax return, the return was self-prepared.

310.  Beneath the words "[y]our occupation," is written "daycare."

311.  Upon information and belief, Angela was employed by Octavia providing child care – not by Walk By Faith.

312.  The Applications and Wage Verifications submitted to DHS for Angela contain false representations about Angela's employment and employment income.

313.  Octavia knew that representations in the Applications and Wage Verifications contained false representations about Angela's employment and employment income, or Octavia completed the Applications and Wage Verifications with reckless disregard for the truth of the representations.

**v.   Kissy Harris (hereafter "Kissy")**

314.   Octavia completed Applications and Wage Verifications submitted to DHS for Kissy. *See* Group Exhibit H.

315.   Between May 2014 and June 2017, Kissy was the beneficiary of CCAP in the amount of $69,956.52.

316.   Kissy was not eligible for those CCAP benefits.

317.   Octavia counter-signed CCAP funds in the amount of $62,383.58 for childcare allegedly provided to Kissy's children.

318.   Those CCAP funds were overpaid.

319.   Applications and Wage Verifications submitted to DHS for Kissy include false representations regarding Kissy's employment.

**Walk By Faith**

320.   On June 23, 2015, an Application and Wage Verification were submitted to DHS for Kissy. *See* Group Exhibit H, 1-5.

321.   According to the June 23, 2015 Application and Wage Verification, Kissy was employed by Walk By Faith.

322.   According to the June 23, 2015 Application and Wage Verification, Kissy's employment with Walk By Faith began in "2014."

323.   On April 5, 2016, an Application and Wage Verification were submitted to DHS for Kissy. *See* Group Exhibit H, 6-10.

324.   According to the April 5, 2016 Application and Wage Verification, Kissy's employment with Walk By Faith began in "2015."

325.   On August 15, 2017, an Application and Wage Verification were submitted to DHS for Kissy. *See* Group Exhibit H, 11-15.

326.   According to the August 15, 2017 Application and Wage Verification, Kissy was employed by Walk By Faith.

327.   According to the August 15, 2017 Application and Wage Verification, Kissy's employment with Walk By Faith began in "2016."


**Boutique**

328.   On April 10, 2017, an Application and Wage Verification were submitted to DHS for Kissy. *See* Group Exhibit H, 15-19.

329.   According to the April 10, 2017 Application and Wage Verification, Kissy was employed by Boutique from five o'clock p.m. to ten o'clock p.m. Monday through Sunday.

330.   According to the April 10, 2017 Application and Wage Verification, Kissy began working for Boutique in "2016."

331.   According to the April 10, 2017 Application, Kissy's employment at Boutique was not a new job from her last Application.

332.   The Application and Wage Verification prior to the April 10, 2017 Application were submitted to DHS on July 21, 2016. *See* Group Exhibit H, 20-24.

333.   According to the July 21, 2016 Application and Wage Verification, Kissy was employed by Walk By Faith from five o'clock p.m. until ten o'clock p.m. Monday through Sunday.

334.   Based on the information in the July 21, 2016; April 10, 2017; and August 15, 2017 Applications and Wage Verifications, Kissy worked for both Walk By Faith and

Boutique seven (7) days a week from five o'clock p.m. to ten o'clock p.m. from 2016 until April 2017.

335.    The July 21, 2016; April 10, 2017; and August 15, 2017 Applications did not report that Kissy was employed by both Walk By Faith and Boutique from 2016 to April 2017, however.

336.    Walk By Faith did not report wages paid to Kissy to IDES.

337.    Likewise, Boutique did not report wages paid to Kissy to IDES.

338.    The representations regarding Kissy's employment information in the Applications and Wage Verifications were false.

339.    Octavia knew that representations in the Applications and Wage Verifications contained false representations about Kissy's employment and employment income, or Octavia completed the Applications and Wage Verifications with reckless disregard for the truth of the representations.

### vi.  Naomi Torres (hereafter "Naomi")

340.    Octavia completed Applications and Wage Verifications submitted to DHS for Naomi. *See* Group Exhibit I.

341.    Between September 2017 and January 2018, Octavia counter-signed CCAP funds in the amount of $7,055.96.

342.    According to Applications submitted to DHS for Naomi, Briana Harden (hereafter "Briana") was Naomi's childcare provider.

343.    Upon information and belief, Briana did not provide childcare for Naomi.

344.    Octavia counter-signed all the CCAP funds issued to Briana for childcare she allegedly provided to Naomi.

345.    Those CCAP funds were overpaid.

346.    An Application submitted to DHS on September 28, 2017 indicates that Naomi began working for Walk By Faith on September 1, 2017. *See* Group Exhibit I, 1-13.

347.    Naomi's hours were two o'clock p.m. to seven o'clock p.m.

348.    An Application and Wage Verification submitted to DHS for Naomi on December 19, 2017 has the same start date with Walk By Faith, but Naomi's hours are listed as three o'clock p.m. to eight o'clock p.m. *See* Group Exhibit I, 15-18.

349.    Walk By Faith did not report wages paid to Naomi to IDES.

350.    An Application submitted on February 22, 2018 indicates that Naomi began working for Aryzta on February 1, 2018. *See* Group Exhibit I, 19-23.

351.    According to the February 22, 2018 Application, Naomi's hours at Aryzta were three o'clock p.m. to nine o'clock p.m.

352.    An Arytza paystub dated February 16, 2018 that was submitted to IAFC's dropbox includes Naomi's Time Card Detail. *See* Group Exhibit I, 24.

353.    Naomi's Time Card Detail on the February 16, 2018 pay stub demonstrates that Naomi's hours were not three o'clock p.m. to nine o'clock p.m.

354.    Likewise, Naomi's hours on Arytza paystubs dated March 2, 2018 and March 16, 2018 submitted to DHS on March 22, 2018 were not three o'clock p.m. to nine o'clock p.m. *See* Group Exhibit I, 25-26.

355.    The Applications submitted to DHS for Naomi contain false representations about Naomi's employment.

356.    Octavia knew that representations in the Applications and Wage Verifications contained false representations about Naomi's employment and employment income, or Octavia completed the Applications and Wage Verifications with reckless disregard for the truth of the representations.

### vii.   Keyania Hamer (hereafter "Keyania")

357.    Octavia completed Applications and Wage Verifications submitted to DHS for Keyania. *See* Group Exhibit J.

358.    Between June 2016 and March 2018, Keyania received CCAP benefits in the amount of $17,981.28.

359.    Keyania was not eligible for those CCAP benefits.

360.    Between June 2016 and March 2018, Octavia counter-signed CCAP funds in the amount of $17,042.08.

361.    Those CCAP funds were overpaid.

362.    According to Applications submitted to DHS for Keyania, Dajanae Jamison (hereafter "Dajanae") was Keyania's childcare provider from May 2016 to March 31, 2017.

363.    According to Applications submitted to DHS for Keyania, Linda Boyd (hereafter "Linda") was Keyania's childcare provider from April 1, 2017 to March 2018.

364.    Upon information and belief, neither Dajanae nor Linda provided child care for Keyania's children.

365.    IDES records indicate that Dajanae was employed by AutoZone the second and third quarters of 2016.

366.    On July 26, 2016, a letter dated July 22, 2016 on AutoZone letterhead and regarding Dajanea's employment was submitted to DHS via walk-in at IAFC's Damen location. *See* Group Exhibit J, 1.

367.    The July 22, 2016 AutoZone Letter stated "Dajanae Jamison is presently employed by AutoZone … Her hours are currently Monday – Friday 6 am to 2 pm."

368.    On January 10, 2017, a letter dated January 9, 2017 on AutoZone letterhead and regarding Dajanea's employment was submitted to DHS via walk-in at IAFC's Damen location. *See* Group Exhibit J, 2.

369.    The January 10, 2017 AutoZone Letter stated "Dajanae Jamison is no longer employed by AutoZone, effective July 14, 2016."

370.    The AutoZone Letters contain false representations.

371.    Octavia knew that representations in AutoZone Letters were false.

372.    Upon information and belief, Octavia retained the CCAP funds issued to Dajanea.

373.    On June 7, 2016, an Application and Wage Verification were submitted to DHS for Keyania via walk-in at IAFC's Damen location. *See* Group Exhibit J, 3-16.

374.    According to the June 7, 2016 Application, Keyania began working at Boutique on May 23, 2016.

375.    The June 7, 2016 Application indicates that Keyania earned "8.75" per hour.

376.    Keyania's job hours are listed as three o'clock p.m. to eight o'clock p.m. 7 days a week.

377.    Keyania was paid "every week."

378.    Five (5) more Applications submitted to DHS for Keyania contain information that Keyania was employed by Boutique beginning in May 2016.

379.   An Application dated March 30, 2017, however, indicates that Keyania started working for Boutique on "1-2017." *See* Group Exhibit J, 17-20.

380.   Boutique did not report wages paid to Keyania to IDES.

381.   The Applications and Wage Verifications submitted to DHS for Keyania contain false representations about Keyania's employment at Boutique.

382.   The Applications submitted to DHS for Keyania contain false representations about Keyania's employment income from Boutique.

383.   Octavia completed the Applications and Wage Verifications submitted to DHS for Keyania that contained false representations about Keyania's employment at Boutique.

384.   Octavia knew that representations in the Applications regarding Keyania's employment by Boutique were false, or Octavia completed the Applications and Wage Verifications with reckless disregard for the truth of the representations.

385.   Octavia knew that representations in the Applications regarding Keyania's childcare providers were false, or Octavia completed the Applications and Wage Verifications with reckless disregard for the truth of the representations.


### viii.   Kierra Daniels (hereafter "Kierra")

386.   Octavia completed Applications and Wage Verifications submitted to DHS for Kierra. *See* Group Exhibit K.

387.   Octavia also provided child care for Kierra's children.

388.   Between April 2015 and November 2017, Kierra received CCAP benefits in the amount of $83,798.22.

389.   Kierra was not eligible for those CCAP benefits.

390.   Between April 2015 and November 2017, Octavia received CCAP funds in the amount of

$83,798.22 for child care she allegedly provided to Kierra's children.

391.   Those CCAP funds were overpaid to Octavia.


**Walk By Faith**

392.   On April 7, 2015, an Application was submitted to DHS for Kierra. *See* Group Exhibit K,

1-13.

393.   According to the April 7, 2015 Application, Kierra began working for Walk By Faith on

April 1, 2015.

394.   Prior to becoming employed by Walk By Faith, Kierra provided child care for Qawana

Brown, another parent for whom Octavia completed Applications, until March 31, 2015.

395.   A Wage Verification was also submitted to DHS on April 7, 2015. *See* Group Exhibit K,

14.

396.   Kierra's start date in the April 7, 2015 Wage Verification was also April 1, 2015.

397.   A Wage Verification submitted on April 10, 2017, however, indicates that Kierra began

working for Walk By Faith in "2016." *See* Group Exhibit K, 15.

398.   Walk By Faith did not report wages paid to Kierra to IDES.

399.   The Applications and Wage Verifications submitted to DHS for Kierra contain false

representations about Kierra's employment.

400.   Octavia knew that representations in the Applications and Wage Verifications contained

false representations about Kierra's employment, or Octavia completed the Applications

and Wage Verifications with reckless disregard for the truth of the representations in

them.

### ix. **Qawana Brown (hereafter "Qawana")**

401. Octavia completed a COP, Applications and Wage Verifications submitted to DHS for Qawana. *See* Group Exhibit L.

402. Between August 2015 and December 2015, Qawana received CCAP benefits in the amount of $4,448.44.

403. Qawana was not eligible for those CCAP benefits.

404. Between August 2015 and December 2015, Octavia counter-signed CCAP funds in the amount of $4,448.44 that were issued to Mycal Ealey.

405. Those CCAP funds were overpaid.

**Walk By Faith**

406. On September 10, 2015, an Application was submitted to DHS for Qawana. *See* Group Exhibit L.

407. According to the September 10, 2015 Application, Qawana began working for Walk By Faith on August 1, 2015.

408. Walk By Faith did not report wages paid to Qawana to IDES.

409. According to the September 10, 2015 Application, Qawana was employed by TLM prior to August 1, 2015.

410. TLM did not report wages paid to Qawana to IDES.

411. The Applications and Wage Verifications submitted to DHS for Qawana contain false representations about Qawana's employment.

412. Octavia knew that representations in the Applications and Wage Verifications contained false representations about Qawana's employment, or Octavia completed the

Applications and Wage Verifications with reckless disregard for the truth of the representations in them.

### x.  Laureana Kianez (hereafter "Laureana")

413.   Octavia completed Applications and Wage Verifications submitted to DHS for Laureana. *See* Group Exhibit M.

414.   Laureana was the beneficiary of CCAP between July 2013 and May 2016.

415.   Laureana was not eligible for those CCAP benefits.

416.   Martwone counter-signed CCAP funds in the amount of $11,781.46 issued to Lakela Johnson (hereafter "Lakela") for child care allegedly provided to Laureana's children.

417.   Martwone counter-signed CCAP funds in the amount of $14,222.94 issued to Carl Terry (hereafter "Carl") for child care allegedly provided to Laureana's children.

418.   Martwone counter-signed CCAP funds in the amount of $73,707.30 issued to Kenneth Jenkins (hereafter "Kenneth") for child care allegedly provided to Laureana's children.

419.   Those CCAP funds were overpaid.

420.   Applications and Wage Verifications were submitted to DHS that contained false representations regarding childcare provided to Laureana's children.

421.   On December 19, 2013, an Application and Wage Verification were submitted to DHS for Laureana. *See* Group Exhibit M, 1-5.

422.   According to the December 19, 2013 Application, Laureana was seeking CCAP benefits to pay childcare provider Kenneth.

423.   According to the December 19, 2013 Application, Kenneth lived at 5952 W. Rice.

424.   On March 3, 2014, a COP was submitted to DHS. *See* Group Exhibit M, 6-12.

425.   The March 3, 2014 COP indicated that the last day Kenneth provided care for Laureana's children was December 31, 2013.

426.   According to the March 3, 2014 COP, Lakela began to provide care for Laureana's children on January 2, 2014.

427.   Upon information and belief, Lakela called DHS on January 31, 2014 to remove herself as Laureana's provider.

428.   A COI submitted to DHS on February 13, 2014 indicates that Kenneth, not Lakela, was Laureana's childcare provider on January 29, 2014. *See* Group Exhibit M, 13-20.

429.   But a letter dated April 23, 2014 and purported to be from Laureana to DHS claimed that Lakela provided care for Laureana's children until March 31, 2014. *See* Group Exhibit M, 21.

430.   A COP was submitted to DHS on April 17, 2014. *See* Group Exhibit M, 22-28.

431.   A COP was submitted to DHS on June 25, 2015. *See* Group Exhibit M, 29.

432.   According to the June 25, 2015 COP, the last date Kenneth provided care for Laureana's children was June 30, 2015.

433.   Kenneth wrote a letter, in which Kenneth wrote: "I did not provide child care and did not receive child care payments for the children they say is been [sic] claim." *See* Group Exhibit M, 30-31.

434.   Kenneth also wrote "I live and [sic] the same location for the pass [sic] 10 + years, which is 41 N. Mayfield Chicago, IL 60644."

435.   Kenneth's Letter is signed eleven (11) times and is notarized.

436.   Kenneth's signature on Kenneth's Letter is different from that on the April 17, 2014 COP submitted to DHS.

437.   Kenneth's signature on Kenneth's Letter is different from the endorsements on warrants issued by the State of Illinois to Kenneth. *See* Group Exhibit M, 13-20.

438.   All the warrants issued to Kenneth were countersigned by Martwone. *See* Group Exhibit M, 32-58.

439.   Applications and Wage Verifications were submitted to DHS.that contained false representations regarding Laureana's employment.

440.   An Application dated December 19, 2013 and Wage Verifications dated December 19, 2013 and April 17, 2014 indicate that Laureana began working for Walk By Faith on September 1, 2013. *See* Group Exhibit M, 1-5, *see also* Group Exhibit M, 59-60.

441.   A Wage Verification submitted to DHS for Laureana on April 14, 2016 indicates that Laureana began working for Walk By Faith in January 2014. *See* Group Exhibit M, 61.

442.   Walk By Faith did not report wages paid to Laureana to IDES.

443.   Octavia knew that representations in the Applications, Wage Verifications, and COPs regarding Laureana's childcare providers were false, or Octavia completed the Applications, Wage Verifications, and COPs with reckless disregard for the truth of the representations in them.

444.   Octavia knew that representations in the Applications and Wage Verifications regarding Laureana's employment were false, or Octavia completed the Applications and Wage Verifications with reckless disregard for the truth of the representations in them.

### xi.   Janee Ridley (hereafter "Janee")

445.   Octavia completed Applications and Wage Verifications submitted to DHS for Janee. *See* Group Exhibit N.

446.    Between November 2013 and December 2016, Janee was the beneficiary of CCAP in the amount of $76,341.51.

447.    Janee was not eligible for those CCAP benefits.

448.    According to Applications, Martwone provided childcare for Janee.

449.    Martwone also counter-signed CCAP funds in the amount of $39,503.31 issued to Kimika Johnson (hereafter "Kimika") for child care allegedly provided to Janee's children.

450.    Upon information and belief, Martwone retained the counter-signed funds.

451.    According to an Application and Wage Verification submitted to DHS on December 20, 2013, Janee was employed by Walk By Faith. *See* Group Exhibit N, 1-5.

452.    According to the December 20, 2013 Janee began working for Walk By Faith on September 1, 2013.

453.    Applications and Wage Verifications submitted to DHS on June 25, 2015 also indicate that Janee began working for Walk By Faith on September 1, 2013. *See* Group Exhibit N, 6-10.

454.    A Wage Verification submitted on June 21, 2016, however, indicates that Janee began working for Walk By Faith in "2014." *See* Group Exhibit N, 11.

455.    According to Applications submitted June 25, 2015; January 5, 2016; and June 21, 2016, Janee continued to be employed by Walk By Faith through at least June 21, 2016. *See* Group Exhibit N, 6-10; *see also* Group Exhibit N, 12-20.

456.    Walk By Faith did not report wages paid to Janee to IDES.

457.    Martwone, the owner of Walk By Faith, was paid CCAP funds in the amount of
        $34,938.00, not including the counter-signed funds issued to Kimika, for childcare he
        allegedly provided to Janee, his employee.

458.    Janee was only eligible for CCAP benefits because she was allegedly employed by Walk
        By Faith.

459.    Upon information and belief, Martwone did not provide childcare for Janee.

460.    Upon information and belief, Walk By Faith did not employ Janee.

461.    Upon information and belief, Walk By Faith's employment of Janee was a false pretense
        to qualify Janee for CCAP benefits.

462.    Upon information and belief, Martwone received CCAP funds because of that false
        pretense.

### xii.   Lanesha Walker (hereafter "Lanesha")

463.    Octavia completed COPs, Applications, and Wage Verifications submitted to DHS for
        Lanesha. *See* Group Exhibit O.

464.    Between June 2017 and April 2018, Lanesha was the beneficiary of CCAP in the amount
        of $18,420.56.

465.    Between June 2017 and November 2017, Martwone counter-signed CCAP funds in the
        amount of $10,779.84 issued to Carl for child care allegedly provided to Lanesha's
        children.

466.    An Application and Wage Verification submitted to DHS on April 10, 2017 indicate that
        Lanesha began working for Walk By Faith on April 1, 2017. *See* Group Exhibit O, 1-7.

467.    Walk By Faith did not report wages paid to Lanesha to IDES.

468.   According to the April 10, 2017 Application, Martwone became both Lanesha's employer and childcare provider on April 1, 2017. *See* Group Exhibit O, 3.

469.   Upon information and belief, Martwone did not provide childcare for Lanesha.

470.   On June 1, 2017, Octavia completed a COP that named Carl as Lanesha's provider because Martwone was not eligible to provide childcare. *See* Group Exhibit O, 8-13.

471.   Upon information and belief, Carl did not provide childcare for Lanesha.

472.   A Wage Verification submitted to DHS on September 14, 2017 indicates that Lanesha began working for Walk By Faith "05-2017," not April 1, 2017. *See* Group Exhibit O, 18.

473.   Upon information and belief, Lanesha was not employed by Walk By Faith.

474.   Upon information and belief, Walk By Faith's employment of Lanesha was a false pretense so that Lanesha would qualify for CCAP funds.

475.   Upon information and belief, Martwone received CCAP funds because of that false pretense.

476.   Octavia knew that representations in the Applications regarding Lanesha's childcare provider were false, or Octavia completed the Applications with reckless disregard for the truth of the representations in them.

477.   Octavia knew that representations in the Applications and Wage Verifications regarding Lanesha's employment were false, or Octavia completed the Applications and Wage Verifications with reckless disregard for the truth of the representations in them.

### xiii.   Bridgette Ayers (hereafter "Bridgette")

478.   Octavia completed an Application and Wage Verification submitted to DHS for Bridgette. *See* Group Exhibit P.

479. On or around April 28, 2015, an Application was submitted to DHS for Bridgette. *See* Group Exhibit P.

480. According to the Application, Bridgette was seeking CCAP benefits to pay childcare provider Carl.

481. According to the April 28, 2015 Application, Bridgette worked for Walk By Faith.

482. In a conversation with DHS's attorney, Bridgette denied that Carl ever provided child care for her children.

483. Likewise, Bridgette also denied that she ever worked for Walk By Faith.

484. Upon information and belief, Carl did not provide child care for Bridgette's children.

485. Upon information and belief, Bridgette was not employed by Walk By Faith.

486. Walk By Faith did not report wages paid to Bridgette to IDES.

487. The Applications submitted to DHS for Bridgette contain false representations about Bridgette's employment.

488. Octavia completed the Applications submitted to DHS for Bridgette that contained false representations about Bridgette's child care provider, or Octavia completed the Applications with reckless disregard for the truth of the representations in them.

489. Octavia knew that representations in the Applications regarding Bridgette's employment were false, or Octavia completed the Applications with reckless disregard for the truth of the representations in them.

## CLAIM I – NON-DISCHARGEABILITY UNDER 11 U.S.C. §523(a)(2)(A) AS TO OCTAVIA JOHNSON

490.    Pursuant to Section 523(a)(2)(A) of the Bankruptcy Code, the debt owed to DHS by Octavia is not dischargeable because the funds were obtained by "false pretenses, a false representation, or actual fraud …" 11 U.S.C. § 523(a)(2)(A).

491.    Plaintiff repleads Paragraphs 1 through 489 as if fully-pleaded herein.

492.    Octavia obtained money by false representation when she completed COIs, COPs, Applications, Income Verifications, and Wage Verifications knowing that representations in them regarding Parents' employment were not true.

493.    Alternatively, Octavia obtained money by false representations when she completed COIs, COPs, Applications, Income Verifications, and Wage Verifications with a reckless disregard for the truth of the representations regarding Parents' employment in them.

494.    Octavia obtained money by false representation when she completed COIs, COPs, Applications, Income Verifications, and Wage Verifications knowing that representations in them regarding childcare provided for Parents were not true.

495.    Alternatively, Octavia obtained money by false representations when she completed COIs, COPs, Applications, Income Verifications, and Wage Verifications with a reckless disregard for the truth of the representations regarding childcare provided for Parents in them.

WHEREFORE, Plaintiff prays that this Court:

   a.    Set the matter of the dischargeability of the debts owed by Octavia to Plaintiff for hearing;

   b.    Find that said debt in the amount of $589,054.80 is not dischargeable;

45

  c. Enter a judgment in the amount of $589,054.80 against Octavia Johnson and

   in favor of Plaintiff; and

  d. Grant such other and further relief as this Court deems just.

## CLAIM II – NON-DISCHARGEABILITY UNDER 11 U.S.C. §523(a)(2)(A) AS TO MARTWONE JOHNSON

496. Plaintiff repleads Paragraphs 1 through 490 as if fully-pleaded herein.

497. Martwone obtained money by false pretenses when he received CCAP funds issued as a result of false representations regarding Parents' employment with his sole proprietorship, Walk By Faith.

498. Martwone obtained money by false pretenses when he received CCAP funds for childcare he did not provide.

WHEREFORE, Plaintiff prays that this Court:

  a. Set the matter of the dischargeability of the debts owed by Martwone to

   Plaintiff for hearing;

  b. Find that said debt in the amount of $194,473.77 is not dischargeable;

  c. Enter a judgment in the amount of $194,473.77 against Martwone Johnson

   and in favor of Plaintiff; and

  d. Grant such other and further relief as this Court deems just.

By: *Anna Stanley Kahriman*
Anna Stanley Kahriman (ARDC No. 6287467)
Office of the Attorney General of Illinois
100 W. Randolph, 13-204
Chicago, IL 60601
(312) 814-6140
akahriman@atg.state.il.us

46